2005-NMSC-016

114 P.3d 1050

David WAGNER, Worker–Appellee/Cross–Appellant,

v.

AGW CONSULTANTS, d/b/a Turner Environmental Consultants, and William M. Turner, individually and as trustee, Employer–InsurerAppellants/Cross–Appellees.

No. 28,348.

Supreme Court of New Mexico.

May 24, 2005.

As Corrected June 29, 2005.

Duhigg, Cronin, Spring & Berlin, P.A. Nancy C. Wagner, Albuquerque, NM for Worker–Appellee/Cross–Appellant.

James R. Beam Albuquerque, NM, for Employer–Insurer–Appellants/Cross–Appellees.

William M. Turner, Pro Se.

Michael B. Browde Albuquerque, NM, McGinn & Carpenter, P.A., Randi McGinn,

Albuquerque, NM, for Amicus Curiae New Mexico Trial Lawyers Association.

Robert M. Aurbach, Special Assistant Attorney General, Albuquerque, NM, for Amicus Curiae Worker's Compensation Administration.

## OPINION

CHÁVEZ, Justice.

{1} Worker prevailed in a heavily litigated worker's compensation claim and was awarded $58,599 in medical expenses, plus $26,761 in past and future weekly benefits. At the hearing on attorney fees, the worker's attorney sought $61,125 in attorney fees, of which the worker would have been liable for $30,562. *See* NMSA § 52–1–54(J) (2003) (providing worker and employer shall share payment of attorney fees equally except as otherwise provided by the statute). Worker argued the $12,500 limitation on attorney fees in NMSA 1978, Section 52–1–54(I) (1993, prior to 2003 amendment) should not apply because such a limitation violated constitutional guarantees of equal protection and due process.[1] The Workers' Compensation Judge took judicial notice of the chilling effect of miserly fees on representation but found the $12,500 award for attorney fees to be reasonable.

{2} The employer appealed the worker's award to the Court of Appeals and the worker cross-appealed the attorney fee award. The Court of Appeals certified the issue of the constitutionality of the limitation on attorney fees and otherwise proposed affirming the compensation award. We accepted certification to decide whether the limitation on attorney fees in Section 52–1–54(I) of the Workers' Compensation Act violates Worker's state constitutional rights to equal protection and due process.

{3} We review the attorney fee limitation provision under rational basis scrutiny, as the record in this case fails to demonstrate that the limitation has a sufficient impact on important rights to trigger a higher level of scrutiny. We hold that the fee limitation is rationally related to legitimate government purposes, particularly those of maximizing the limited benefits workers may currently obtain through the workers' compensation system. On these facts, were we to declare the fee limitation unconstitutional, the worker's benefits of $26,761 would be insufficient to pay his share of the $61,125 in requested attorney fees. The $12,500 attorney fee limitation, which in this case limits the worker's share of attorney fees to $6,250, still allows the worker to take home $20,511 in benefits. Therefore, while we do not decide whether other provisions of Section 52–1–54 would pass constitutional muster, we uphold the fee limitation itself. We adopt and append the Court of Appeals' analysis to all other issues raised in this appeal and cross-appeal. *See Wagner v. AGW Consultants*, No. 22,370 (N.M.Ct.App. Oct. 24, 2003) (certification order).

## BACKGROUND

{4} David Wagner (Worker) filed a claim for workers' compensation benefits against AGW Consultants, d/b/a Turner Environmental Consultants (AGW), a ground-water hydrology consulting firm where he was injured while employed as a geologist. After realizing that AGW was a business trust, Worker amended his complaint to add as a defendant William Turner, AGW's sole trustee, in the event that Turner was the real party in interest. Turner appeared pro se to challenge Worker's claim, while separate counsel represented AGW.

{5} Several issues were heavily litigated at trial, including the applicability of the Workers' Compensation Act (WCA) to AGW, whether Turner was a real party in interest, the extent of Worker's injury, and the constitutionality of the attorney fee limitation. Turner himself filed a significant number of the roughly 2,500 pages of pleadings, independent of post-judgment motions and this appeal. The Workers' Compensation Judge ("WCJ") noted that although the issues were

---

1. At the time of this case, Section 52–1–54(I) of the WCA limited attorney fees to $12,500. Section 52–1–54(I) was amended in 2003 to raise the attorney fee limitation to $16,500. NMSA 1978, § 52–1–54(I) (2003). Because this case was already pending at the time the statute was amended, this Opinion considers only the constitutionality of the pre–2003 fee limitation.

of average complexity, the case had the most extensive pleading record he had ever seen. At one point the WCJ stated on the record that had Turner been an attorney, the WCJ would have issued sanctions against him for repeatedly filing motions without merit. The WCJ did not initially enter findings of fact or conclusions of law regarding whether the parties engaged in bad faith, and therefore whether either party was entitled to additional attorney fees up to $2,500 under Section 52–1–54(I). On appeal the Court of Appeals retained jurisdiction but ordered the WCJ to enter findings and conclusions regarding the issue of bad faith. The WCJ found that some of Turner's pleadings were frivolous and without sound basis in law, but concluded that Turner's bad faith was irrelevant to awarding additional attorney fees under Section 51–2–54(I) because Turner was not Worker's employer. The WCJ ultimately found that Worker was an employee of AGW and that AGW was subject to the WCA, ordering AGW to pay Worker $58,599 in medical expenses and $26,671 in past and future weekly benefits.

{6} At the subsequent hearing on attorney fees, Worker's attorney claimed to have worked more than 400 hours, at $150 per hour, on the pre-trial and trial work. Worker's attorney argued the $12,500 statutory limitation on attorney fees was unreasonable in this case given the extraordinary amount of time involved, and that the limitation was unconstitutional due to its chilling effect on workers' ability to obtain adequate representation. Worker presented expert testimony that the fee limitation can be unfair and can make it uneconomical for attorneys to pursue certain time-consuming cases. AGW and Turner challenged the jurisdiction of the WCJ to declare Section 52–1–54 unconstitutional and did not present evidence in support of the fee limitation.

{7} The WCJ awarded Worker $12,500 in attorney fees and made the following findings: (1) Worker's attorney reasonably expended over 200 hours at an hourly rate of $175 per hour,[2] (2) the miserly fee limitation

has a chilling effect on representation, and (3) $12,500 was a reasonable fee in this case. On certification, Worker argues the attorney fee limitation violates state equal protection and substantive due process, claiming that as applied, the limitation unconstitutionally infringes on the right to access the courts and the right to an appeal guaranteed in the New Mexico Constitution. AGW contends Worker does not have standing to challenge the fee limitation and that in any event the fee limitation is constitutional.

## I. Worker Has Standing to Challenge Fee Limitation

{8} AGW claims Worker lacks standing to challenge the constitutionality of the fee limitation under *Mieras v. Dyncorp,* 1996–NMCA–095, ¶ 22, 122 N.M. 401, 925 P.2d 518, because the WCJ specifically found the $12,500 attorney fee to be reasonable and declined to find that Worker's attorney would have been entitled to a higher attorney fee but-for the limitation. We disagree.

{9} To have standing, Worker must either show, or the WCJ must explicitly find, that but for the fee limitation, reasonable attorney fees would have exceeded the awarded amount. *See Meyers v. Western Auto & CNA Ins. Cos.,* 2002–NMCA–089, ¶ 29, 132 N.M. 675, 54 P.3d 79; *cf. Mieras,* 1996–NMCA–095, ¶ 22, 122 N.M. 401, 925 P.2d 518 (holding the claimant had standing where the WCJ specifically found the value of the attorney's services to exceed the limitation). Although the WCJ found $12,500 to be a reasonable fee, the WCJ also found that Worker's attorney reasonably expended over 200 hours representing Worker at a fee of $175 per hour. While these findings appear inconsistent, the latter indicates at a minimum that but for the limitation, Worker's attorney would have been reasonably entitled to at least $35,000 in attorney fees even before this appeal. Unlike in *Meyers,* where the claimant lacked standing because he neither reached the fee limitation nor showed that he would have secured a higher attorney fee in the absence of the limitation, 2002–

---

**2.** Apparently the judge mistook Worker's attorney's fees for $175 an hour instead of the $150 hourly rate she requested.

NMCA–089, ¶ 29, 132 N.M. 675, 54 P.3d 79, here Worker not only reached the limitation, but the WCJ found that his attorney reasonably expended over 200 hours at $175 an hour, bringing him well over the limitation of $12,500.

{10} We note that the fact Worker is represented by counsel, who continues to honor her ethical duty to represent him, does not preclude standing in this case. *See* Rule 16–116(B)(5) NMRA 2005 (declining or terminating representation). In *Corn v. New Mexico Educators Fed. Credit Union,* the Court of Appeals held the claimant had standing to challenge the constitutionality of the unilateral limitation on workers' attorney fees although claimant continued to be represented by counsel. 119 N.M. 199, 202, 889 P.2d 234, 237 (Ct.App.1994), *overruled on other grounds in Trujillo v. City of Albuquerque,* 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305 (*Trujillo III* ) (overruling *Corn* to the extent it adopted a fourth tier of scrutiny, while affirming *Corn's* holding and subsuming its "heightened rational basis" analysis under a "modern rational basis" standard). The WCJ in *Corn* found that but for the limitation, the claimant's attorney would have been entitled to nearly $20,000, and noted that although attorneys exceeded the limitation in only one of five hundred cases, the limitation caused workers to be at an unfair disadvantage compared to employers and significantly reduced the number of competent attorneys willing to take workers' compensation cases. *Id.* at 201, 208, 889 P.2d at 236, 243. Although the claimant in *Corn* was represented, the court found a significant risk of future injury because his attorney could withdraw during the appeals process if the lack of payment posed an unreasonable financial burden, which would have required claimant to "pursue matters of impairment and permanent disability without the aid of counsel." *Id.* at 202, 889 P.2d at 237.

{11} Thus, despite the fact that Worker is represented by counsel, he has shown that he is at risk of significant injury because of his inability to compensate a lawyer on appeal. Section 52–1–54 prohibits Worker from paying his counsel more than $12,500, either before the WCA or on appeal. *See* § 52–1–54(A), (I), (N) (making it unlawful to accept fees except as provided in the Act, punishable as a misdemeanor offense). The ethical rules allow Worker's lawyer to withdraw if the case poses an "unreasonable financial burden," and Worker would be unable to offer a new attorney any compensation on appeal. *See id.;* Rule 16–116(B)(5). This evidence certainly does not detract from Worker's having standing; if anything, it strengthens his argument. We hold Worker has standing to challenge the constitutionality of the fee limitation.

## II. Rational Basis is the Appropriate Level of Scrutiny

{12} Before turning to the merits of the equal protection and due process challenges, we must identify the appropriate level of scrutiny for reviewing the challenged law. What level of scrutiny we use depends on the nature and importance of the individual interests asserted and the classifications created by the statute. *See Mieras,* 1996–NMCA–095, ¶ 24, 122 N.M. 401, 925 P.2d 518. Ordinarily we defer to the Legislature's judgment in enacting social and economic legislation such as the WCA. *See Corn,* 119 N.M. at 204, 889 P.2d at 239. So long as such legislation does not impact important rights or protected classes, it is upheld unless the challenger can show the provision at issue is not rationally related to a legitimate government purpose. *See Trujillo III,* 1998–NMSC–031, ¶¶ 14, 26, 125 N.M. 721, 965 P.2d 305; *Mieras,* 1996–NMCA–095, ¶ 30, 122 N.M. 401, 925 P.2d 518. If legislation impacts important but not fundamental rights, or sensitive but not suspect classifications, intermediate scrutiny is warranted and we require the State to demonstrate that the law is substantially related to an important government purpose.[3] *Mieras,* 1996–NMCA–

---

**3.** We emphasize that this standard requires *either* an important right *or* a sensitive class, contrary to what we may have suggested in dicta in *Trujillo III,* 1998–NMSC–031, ¶ 15, 125 N.M. 721, 965

P.2d 305, and *Richardson v. Carnegie Library Rest., Inc.,* 107 N.M. 688, 693, 763 P.2d 1153, 1158 (1988), *overruled on other grounds by Trujillo III,* 1998–NMSC–031, ¶¶ 18–21, 32, 125 N.M.

095, ¶ 26, 122 N.M. 401, 925 P.2d 518. If a law draws suspect classifications or impacts fundamental rights, we apply strict scrutiny and require the State to demonstrate that the provision at issue is closely tailored to a compelling government purpose. *See id.* ¶ 25.

{13} Worker and amicus New Mexico Trial Lawyers Association (NMTLA) urge us to review the attorney fee limitation under intermediate or strict scrutiny, arguing that the fee limitation impacts important or fundamental rights. They contend that certain claimants cannot obtain adequate representation because the fee limitation discourages lawyers from taking their cases, and that this lack of adequate representation threatens the meaningful exercise of two separate rights: (1) meaningful access to the courts as implied in the due process clause of the state constitution, *see* N.M. Const. art. II, § 18; *Richardson,* 107 N.M. at 696, 763 P.2d at 1161; and (2) the explicit constitutional right to an appeal in New Mexico. N.M. Const. art. VI., § 2. To warrant intermediate or strict scrutiny, Worker must first persuade us that at least one of these rights is "important" or "fundamental," and secondly that such a right is sufficiently impacted to warrant more than minimal scrutiny.

### Worker Fails to Demonstrate the Impact on Important Constitutional Rights Is Sufficient to Trigger Intermediate Scrutiny

{14} New Mexico appellate courts have previously recognized that the right to access the courts and the right to an appeal are important, although not fundamental, rights for purposes of constitutional analysis. *See Trujillo III,* 1998–NMSC–031, ¶¶ 18–19, 125 N.M. 721, 965 P.2d 305; *Herndon v. Albuquerque Pub. Schools,* 92 N.M. 287, 288, 587 P.2d 434, 435 (1978); *Mieras,* 1996–NMCA–095, ¶¶ 48, 51, 122 N.M. 401, 925 P.2d 518 (Hartz, J., specially concurring). Because the right to access the courts and

the right to an appeal are synonymous in the context of the workers' compensation system, as both are implicated when a litigant seeks to appeal an administrative decision to the judicial branch, we consider them collectively. *See Herndon,* 92 N.M. at 288, 587 P.2d at 435; *Trujillo III,* 1998–NMSC–031, ¶ 21, 125 N.M. 721, 965 P.2d 305; *Mieras,* 1996–NMCA–095, ¶¶ 48, 51, 122 N.M. 401, 925 P.2d 518 (Hartz, J., specially concurring). Any legislation shown to truly impact these appellate rights should be subjected to more than rational basis review. *See, e.g., Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 830–32 (1980) (applying intermediate scrutiny to invalidate a statute that limited medical malpractice recovery, after holding the right to recover for personal injuries was an important right under the state constitution).

{15} Worker argues that the fee cap impacts workers' appellate rights because it discourages lawyers from taking complex or time-consuming cases, depriving those claimants of meaningfully exercising their appellate rights. Meaningful access to our appellate courts depends in part on an individual's ability to obtain adequate representation. *See Herndon,* 92 N.M. at 288, 587 P.2d at 435; *Mieras,* 1996–NMCA–095, ¶ 48, 122 N.M. 401, 925 P.2d 518 (Hartz, J., specially concurring) ("A statute that deprives someone of the ability to obtain adequate representation in litigation could, in a very real sense, deprive the person of a right of access to the courts."); *Corn,* 119 N.M. at 210, 889 P.2d at 245 (Apodaca, J., concurring). Whether representation is "adequate," however, depends on the circumstances, including the nature of proceedings and the ability of the other side to secure representation. *See United States Dep't of Labor v. Triplett,* 494 U.S. 715, 733–34, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (Marshall, J., concurring) (distinguishing the complexities and adversarial nature of the regulatory system for obtaining benefits under the Black Lung Benefits Act from the more informal Veter-

721, 965 P.2d 305 (adopting rational basis test as appropriate standard for reviewing equal protection challenge to damage cap, rather than the intermediate scrutiny standard used in *Richardson,* but upholding the result in *Richardson* under modern rational basis test). Both cases indi-

cated that intermediate scrutiny is used when a statute impacts important rights *and* sensitive classes. *See Alvarez v. Chavez,* 118 N.M. 732, 736, 886 P.2d 461, 465 (Ct.App.1994); *Plyler v. Doe,* 457 U.S. 202, 223–24, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

ans Administration system at issue in *Walters v. Nat'l Ass'n of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985), such that the due process challenge in *Triplett* would have been successful had claimants shown the fee limitation deprived claimants of legal representation in proceedings under the Act); *Corn,* 119 N.M. at 207–08, 889 P.2d at 242–43.[4]

{16} In arguing that intermediate scrutiny applies, it is not enough to simply point to an important constitutional right; the challenger must show that the legislation in fact impacts the exercise of this right. *See Mieras,* 1996–NMCA–095, ¶¶ 48–52, 122 N.M. 401, 925 P.2d 518 (Hartz, J., concurring). To support their argument that the fee limitation makes it difficult for those with complex or highly contested cases to obtain representation, and that such a "chilling effect" effectively deprives these workers of their appellate rights, Worker and amicus NMTLA rely on testimony presented at trial about the impact of the fee limitation on representation. Worker's expert, a workers compensation attorney, opined that the number of New Mexico attorneys who exclusively represent claimants in workers' compensation proceedings have decreased to about two or three since the benefits scheme was restructured in 1991,[5] and that in light of this reduction in available benefits, the fee limitation can be unfair to workers' attorneys in some circumstances, may discourage claimants' attorneys from pursuing complex or time-consuming cases, and should be relaxed in particularly time-consuming cases.

{17} The record in this case is not meaningfully different from that in *Mieras,* where the Court of Appeals was unpersuaded that the fee limitation infringed on the right to access the courts by preventing a class of workers from obtaining adequate representation. *See Mieras,* 1996–NMCA–095, ¶¶ 27, 34, 122 N.M. 401, 925 P.2d 518; *see also id.* ¶¶ 49–52 (Hartz, J., specially concurring) (noting that claimant failed to show the cap actually prevented workers with complex cases from obtaining adequate representation). In *Mieras,* the claimant demonstrated that the limitation on attorney fees prevented her attorney from being compensated for the time he reasonably expended on behalf of his client. *Id.* ¶¶ 17–19. The claimant failed, however, to illustrate how the fee limitation resulted in workers being denied adequate representation, either in theory or fact. *Id.* ¶¶ 49–52 (Hartz, J., specially concurring). The court therefore applied rational basis review. *Id.* ¶ 27.

{18} As in *Mieras,* the record here fails to demonstrate that some claimants are unable to obtain representation in workers' compensation proceedings, either initially or on appeal, or that a decrease in available attorneys renders access to our appellate courts any less meaningful. Worker's expert did not directly attribute a decline in available lawyers to the attorney fee limitation, nor did Worker offer any direct evidence in support of this testimony. Rather, Worker's expert seemed to emphasize that the decline in lawyers representing workers was due to the overall reduction in benefits to injured workers. While the WCJ found a "chilling effect of miserly attorney fees on representation," the record fails to show that this chilling effect has impacted claimants' ability to access the courts sufficiently to trigger intermediate scrutiny of Section 52–1–54(I). *See Triplett,* 494 U.S. at 724, 110 S.Ct. 1428 (holding the affidavits of three lawyers,

---

4. The dissent maintains that representation is particularly important at the appellate level, Dissent, ¶¶ 48–49, and cautions that we "should not encourage parties to attempt the rigors of the appellate process unaided by counsel." Dissent, ¶ 62. In doing so, the dissent seems to minimize the significance of administrative hearings in workers compensation cases. In fact, it is at the workers compensation level that skilled counsel is most crucial to ultimately preserving benefits awarded to an injured worker. The better the quality of the record below, the greater the likelihood of prevailing on the merits on appeal, particularly given the Court of Appeals' efficient

summary calendar process, supported by a skilled and dedicated Prehearing Division.

5. Amicus Workers' Compensation Administration alleges that in fact there was an increase in attorneys who represented workers before the WCA. Again, because this information is not in the record and was not subject to cross-examination to test its accuracy, we cannot rely on it. *See State v. Martin,* 101 N.M. 595, 603, 686 P.2d 937, 945 (1984) (appellate court cannot consider facts that are not of record).

which stated anecdotally that there were fewer qualified lawyers available to take black lung cases due to the attorney fee limitation, were "blatantly insufficient" to demonstrate that claimants could not obtain representation due to the fee limitation, even if assertions were left unrebutted); *see also Trujillo III*, 1998–NMSC–031, ¶¶ 19–23, 125 N.M. 721, 965 P.2d 305.

{19} Before finding that the fee limitation meaningfully impacts claimants' appellate rights, therefore, we would require more evidence in the record, such as testimony or data showing that workers with complex cases are unable to obtain representation due to the fee limitation. *See Triplett*, 494 U.S. at 723–24, 110 S.Ct. 1428. Our conclusion might also be different in a case in which, because of the fee limitation, a worker's lawyer were unable to continue representing the worker on appeal because of the unreasonable financial burden, thus relieving the lawyer of the ethical duty to continue representation, or a worker were dissatisfied with his attorney but could not afford to hire a new attorney on appeal. *See, e.g., Crosby v. State of New York, Workers' Compensation Bd.*, 57 N.Y.2d 305, 456 N.Y.S.2d 680, 442 N.E.2d 1191, 1194–95 (1982); *cf. Mieras*, 1996–NMCA–095, ¶ 34, 122 N.M. 401, 925 P.2d 518 (recognizing that the fee limitation "may under certain circumstances preclude any additional award of attorney fees for appellate legal services when the maximum limit has been attained for legal services rendered at the trial level," although those circumstances did not exist in that case).

{20} In seeking to elevate our review to intermediate scrutiny under the facts of this case, the dissent suggests a more "charitable" approach, even to the extent of selectively considering anecdotal information not of record. Dissent, ¶¶ 51–52. However, the facts and record of this case simply do not demonstrate how the fee limitation impacts the right to access the courts and the right to an appeal. Worker was free to appeal her case from the workers' compensation proceedings and did so. She continues to be represented by her counsel, whom we commend for her skilled and committed advocacy on behalf of her client, particularly in light of the volume of "frivolous and excessive" pleadings filed by the pro se litigant at the administrative level. Because this case fails to demonstrate that the fee limitation impacts important rights or sensitive classes, rational basis is the proper standard of review for reviewing the equal protection and due process challenges.

### III. Equal Protection Challenge to Fee Limitation

{21} The New Mexico Constitution provides that no person shall be denied equal protection of the laws. N.M. Const. art. II, § 18. Like its federal equivalent, this is essentially a mandate that similarly situated individuals be treated alike, absent a sufficient reason to justify the disparate treatment. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Garcia ex rel. Garcia v. La Farge*, 119 N.M. 532, 537, 893 P.2d 428, 433 (1995).

{22} In *Corn*, we evaluated an equal protection challenge to the WCA fee limitation and declared the fee limitation unconstitutional because it applied only to the worker's attorney. *Corn*, 119 N.M. at 209, 889 P.2d at 244. While *Corn* was pending, the Legislature partially corrected the inequality by amending the fee limitation provision to apply to both employers and workers. § 52–1–54(A) (1990). Nonetheless, the Legislature continues to treat workers and employers differently in a manner which may disparately affect workers' rights to access our appellate courts by requiring workers to obtain judicial approval for attorney fees without imposing the same requirement on employers under Section 52–1–54(C). Employers, through their insurance companies, are free to contract to pay their attorneys up to $12,500 for each workers compensation case, regardless of the work expended or any of the factors relevant to assessing reasonable fees for workers' attorneys. *Compare* Tex. Lab.Code Ann. §§ 408.221, 408.222 (Vernon 2005) (requiring agency or judicial approval of attorney fees for both claimants and employers). Further, employers' attorneys are compensated whether they win or lose, while workers' attorneys are only paid if they se-

cure benefits for the worker. *See* § 52–1–54(G). The statutory scheme may allow employers to absorb the cost of time-consuming cases by compensating their attorneys over the long run in a way that workers may not, and, as a result, may disparately impact the appellate rights of workers. However, because this issue was not raised and briefed by the parties below, we will not consider it for the first time on appeal. *See Richardson*, 107 N.M. at 692, 763 P.2d at 1157. Therefore, our inquiry is confined to whether the fee limitation in Section 52–1–54(I) distinguishes between similarly situated individuals, and if so whether Worker has demonstrated that the limitation is not rationally related to a legitimate government purpose.

{23} As applied, Section 52–1–54(I) creates two classes of workers compensation litigants: those who do and do not reach the limitation at the administrative stage, and consequently those who can and cannot lawfully pay an attorney a reasonable fee on appeal.[6] *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (holding law violated equal protection as applied, although neutral on its face). Although Worker also urges us to recognize a class of workers with complex cases who are unable to obtain adequate representation because of the fee limitation, Worker fails to demonstrate both that this class exists and how he would be a member of such a class. Worker's case was not found to be unusually complex; rather, the record suggests the case was time-consuming because of the pro se litigant's frivolous and excessive pleadings.[7] Nonetheless, having determined that Section 52–1–54(I) does differentiate between two classes of workers compensation litigants, we must now decide whether such disparate treatment is rationally related to a legitimate government purpose. *See Trujillo III*, 1998–NMSC–031, ¶ 14, 125 N.M. 721, 965 P.2d 305.

{24} While our rational basis test is neither "toothless" nor a "rubber stamp" for challenged legislation, it nonetheless requires us to defer to the validity of the statute, with the challenger carrying the burden of persuasion. *See id.* ¶¶ 14, 30. To successfully challenge the statute under this standard of review, Worker must demonstrate that the classification created by the legislation is not supported by a "firm legal rationale" or evidence in the record. *See Corn*, 119 N.M. at 203–04, 889 P.2d at 238–39. This Worker fails to do.

### Section 52–1–54(I) is Rationally Related to a Legitimate Government Purpose

{25} The WCA was enacted as an exclusive remedy for employees to subject employers to liability without fault for work-related injuries. *Mieras*, 1996–NMCA–095, ¶ 30, 122 N.M. 401, 925 P.2d 518. We have consistently stated our approval of the Legislature's principal objectives in enacting the WCA: (1) maximizing the limited recovery available to injured workers, in order to keep them and their families at least minimally financially secure; (2) minimizing costs to employers; and (3) ensuring a quick and efficient system. NMSA 1978, § 52–5–1 (1990); *see Archer v. Roadrunner Trucking Inc.*, 1997–NMSC–003, ¶ 7, 122 N.M. 703, 930 P.2d 1155; *Sanchez v. M.M. Sundt Constr. Co.*, 103 N.M. 294, 296–97, 706 P.2d 158, 160–61 (Ct.App.1985). We believe the first goal, maximizing a worker's recovery, is particularly important in the workers' compensation arena, where workers' ability to recover needed benefits is circumscribed by the legislation itself. *See Walters*, 473 U.S. at 321–22, 334, 105 S.Ct. 3180 (recognizing the rational government policy of maximizing claimants' awards in rejecting a procedural due process challenge to the ten dollar limitation on at-

**6.** In addition, as discussed above, by subjecting workers, but not employers, to judicial approval of reasonable attorney fees, Section 52–1–54 creates an additional classification of those who can and cannot lawfully contract to pay an attorney of their choice reasonable fees on appeal. Again, however, the facts and record of this case do not squarely present such an issue, nor was this particular classification discussed by the parties

below. *See Richardson*, 107 N.M. at 692, 763 P.2d at 1157.

**7.** In this case, the WCJ may have been able to minimize the time expended by the attorneys by using appropriate sanctions to control the courtroom. *See* NMSA 1978, § 52–5–6(B) (2001). However, whether the WCJ was correct in his use of sanctions is not before us.

torney fees for those seeking benefits for service-connected deaths or disabilities in Veterans Administration proceedings); *cf. Mieras,* 1996–NMCA–095, ¶ 39, 122 N.M. 401, 925 P.2d 518 (Hartz, J., specially concurring) (describing the severe restrictions on recovery in workers' compensation actions).

{26} Worker does not challenge these government purposes for the attorney fee limitation, but rather argues that the fee limitation is not rationally related to these purposes. Contrary to Worker's argument, we find there to be a firm legal rationale, supported by the record of this case, to justify the $12,500 attorney fee limitation as a rational means to achieving the Legislature's goals. As we recognized in *Corn,* it is certainly rational for the State to minimize the role of attorneys in seeking to maximize claimants' awards quickly and efficiently. 119 N.M. at 208, 889 P.2d at 243. In addition, as we have already noted, the fee limitation is important to maximizing the limited benefits available to workers, particularly when workers must generally pay half of their attorneys' fees. *See* § 52–1–54(J); *Mieras,* 1996–NMCA–095, ¶ 38, 122 N.M. 401, 925 P.2d 518 (Hartz, J., specially concurring); *see also Corn,* 119 N.M. at 207, 889 P.2d at 242.

{27} In this case, Worker's $12,500 attorney fee award represented just under fifteen percent of Worker's total award, not including future medical benefits. This is well within the parameters that this Court has identified as generally appropriate for attorney fees in workers' compensation cases. *Woodson v. Phillips Petroleum,* 102 N.M. 333, 338, 695 P.2d 483, 488 (1985) (noting, *inter alia,* that in states that set attorney fees at some percentage of the worker's recovery, ten to twenty percent is generally considered to be an appropriate range). On the other hand, the fee proposed by Worker's attorney was $61,125, or 407.5 hours at $150 an hour. In contrast to the generally accepted ratio of attorney fees to total recovery, this proposed fee would have amounted to roughly seventy-two percent of the Worker's

total award, not including time spent on appeal. Further, of the $85,360 that the WCJ awarded to Worker, only $26,761 was for actual compensation, while the bulk of the award was to cover Worker's medical expenses. Because Worker would have been liable for half of his attorney's proposed fee of $61,125, Worker's attorney fees would have exceeded his actual compensation. Were we to strike the fee limitation, Worker would be required to deplete his entire compensation award and dig into his own pocket to pay his attorney fees. While we do not pass on whether such attorney fees were reasonable in this case, these figures certainly suggest that the attorney fee limitation of $12,500 is a rational means to maximize a worker's take-home award.

{28} Worker points to no legal authority or evidence in the record to show the $12,500 fee cap is an arbitrary and irrational means to achieve the State's objectives. For instance, there is no evidence in the record to suggest either what percentage of claimants approach or reach the fee limitation at the administrative level, or the typical amount of time expended by attorneys either at the administrative level or on appeal in such cases, to somehow demonstrate that $12,500 is an irrational figure.[8] *Cf. Corn,* 119 N.M. at 208, 889 P.2d at 243 (finding that the WCA's data that less than one fifth of one percent exceeded the limitation undermined the State's rationale by showing a de minimus effect from the unilateral limitation). There is simply no evidence in the record to demonstrate that, other than in this particular case, $12,500 has been insufficient to cover workers' attorney fees at the administrative and appellate levels. The dissent proposes, as an alternative to the current scheme it describes as inflexible, that the Legislature maintain an attorney fee limitation but create a separate category of fees on appeal. Dissent, ¶ 60. The dissent does not necessarily quarrel with a fee limitation but disagrees on where to draw the line. It remains unclear what the dissent believes would be an appropriate limitation for appel-

---

8. According to amicus WCA, reasonable attorney fees would have exceeded the $12,500 limitation in only 1.5% of workers' compensation cases

prior to 2003. Again, this information was not in the record, so it is of little use to us here.

late fees, presumably because of the lack of any evidence in the record to suggest what such a limit should be, or how this alternative would make the fee limitation more flexible. If the legislation provided for a limit of $10,000 in attorney fees at the administrative level and $2,500 on appeal, how would that make the scheme more flexible or less burdensome on the worker? The dissent also fails to address the fact that such fees would still reduce the worker's take-home award.

{29} We find nothing in Worker's argument to undermine the rationale that by limiting attorney fees at $12,500, Section 52–1–54(I) helps to maximize workers' take-home awards, minimize costs to employers and increase the efficiency of the system for the reasons discussed above.[9] Further, the fact that the Legislature increased the fee limitation to $16,500 in 2003 suggests to us that rather than setting the fee limitation arbitrarily, the Legislature continues to consider the role of attorney fees in order to maximize workers' awards while minimizing litigation costs. Because Worker fails to show the $12,500 fee limitation is not rationally related to a legitimate government purpose, his equal protection challenge must fail.[10]

## IV. Due Process Challenge to Fee Limitation

{30} The due process clause in the New Mexico Constitution reads: "No person shall be deprived of life, liberty or property without due process of law ...". N.M. Const. art. II, § 18. Substantive due process cases inquire whether a statute or government action " 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.' " See State v. Rotherham, 1996–NMSC–048, 122 N.M. 246, 259, 923 P.2d 1131, 1144 (quoting United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (quoted authorities omit-

ted)). Worker and amicus NMTLA argue the fee limitation unconstitutionally interferes with workers' substantive due process rights to access the courts and to an appeal by chilling qualified lawyers from taking their cases. Using the rational basis standard discussed in Section II, we uphold Section 52–1–54(I) under substantive due process unless Worker shows it is not rationally related to a legitimate governmental purpose. Id. ¶¶ 101–02.

{31} For the reasons stated above, Worker and amicus NMTLA fail to show that Section 52–1–54(I) is not rationally related to the legitimate government purposes. See Triplett, 494 U.S. at 723–24, 110 S.Ct. 1428 (holding that anecdotal evidence, in the form of attorneys' conclusions that a fee limitation would negatively impact the quality of representation or cause attorneys to leave the field of practice, was insufficient to prove due process violation); Rhodes v. Indus. Comm'n, 125 Idaho 139, 868 P.2d 467, 470–71 (1993). Under the facts and record of the present challenge, the fee limitation satisfies substantive due process as well as equal protection.

## CONCLUSION

{32} We hold that under the record in this case, the WCA attorney fee limitation satisfies state guarantees of equal protection and due process. Section 52–1–54(I) is rationally related to legitimate government purposes, particularly the important goal of maximizing workers' recovery. Assuming the Legislature limits workers' recovery in a constitutional manner, the fee limitation is a rational means to advance this goal. We adopt the Court of Appeals' analysis and conclusions regarding the remaining issues that were raised on appeal. We affirm.

{33} **IT IS SO ORDERED.**

---

9. The WCA also argues that the fee limitation minimizes insurance costs, which keeps down insurance premiums, increases economic development and employment, and encourages employers to continue to support and follow the mandatory system. However, there is no evidence to support this in the record and we decline to find this to be a firm legal rationale.

10. This limited holding in no way suggests our belief that by requiring judicial approval for workers', but not employers', attorney fees, Section 52–1–54(C) rationally furthers the goals of minimizing costs to employers or maximizing workers' take-home awards.

WE CONCUR: PAMELA B. MINZNER, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.

RICHARD C. BOSSON, Chief Justice (concurring in part and dissenting in part).

BOSSON, Chief Justice (concurring in part and dissenting in part)

{34} I concur in part and dissent in part. Under the facts of this case, I reluctantly agree that the attorney fee limitation in NMSA 1978, Section 52–1–54(I) (1993) of the Workers' Compensation Act (the Act) passes the rational basis test, and is therefore constitutional, for proceedings before the Workers' Compensation Administration (the Administration). I write separately to express my concerns regarding the effect of the attorney fee limitation on a worker's right to appeal.

{35} In my mind, the absence of any provision for attorney fees at the appellate level impermissibly burdens the constitutional rights of those workers with complex or time-consuming cases. I believe the Legislature's failure to allow additional fees in the limited number of cases that reach our courts after exhausting the cap is contributing to an intolerable decline in adequate representation in the field of workers' compensation law. While I am not yet convinced that this decline impacts workers' access to the courts to the point of violating due process and equal protection rights in administrative proceedings, I would reach a different result when analyzing the impact of the fee limitation on the right to appeal.

{36} In part, I disagree with the majority because I would apply intermediate scrutiny to the important right to have access to the judiciary for the purpose of an appeal. Under intermediate scrutiny analysis, I would find the cap unconstitutional. I also dissent because I am troubled with the way the majority presents the rational basis test. I think our courts, attorneys, and litigants in New Mexico would benefit from further elaboration.

*Rational Basis Test*

{37} To begin, I respectfully disagree with the rational basis test presented by the majority. Ever since we overruled the fourth tier of judicial scrutiny defined as heightened rational basis in *Trujillo v. City of Albuquerque*, we have avoided explaining what we meant by our so-called "modern articulation" of the rational basis test. 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305 (*Trujillo III* )(overruling, but "subsuming" the fourth tier of rational basis analysis applied in *Alvarez v. Chavez*, 118 N.M. 732, 738–39, 886 P.2d 461, 467–68 (Ct.App.1994) and *Corn v. New Mexico Educators Fed. Credit Union*, 119 N.M. 199, 202–04, 889 P.2d 234, 237–39 (Ct. App.1994)). I am afraid we continue to avoid explaining that test today in a way that will only perpetuate confusion.

{38} The majority professes that our rational basis test is one test, simultaneously deferential to the validity of the statute but not a "rubber stamp" or "toothless." Maj. Op. ¶ 24. The majority then explains the requirements of our rational basis test by using language from *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) that was referred to in *Corn*, 119 N.M. at 204, 889 P.2d at 239 (requiring legislative classifications to be supported by either a factual foundation or a firm legal rationale). The majority accepts that although *Corn* and *Alvarez* were overruled in *Trujillo*, *Trujillo* subsumed the "heightened rational basis" analysis from those cases in the modern rational basis test. Thus, in the majority's words: "To successfully challenge the statute under this standard of review, Worker must demonstrate that the classification created by the legislation is not supported by a 'firm legal rationale' or evidence in the record." Maj. Op. ¶ 24.

{39} I believe the language from *Cleburne* in fact creates a different test than the type of minimal scrutiny we usually associate with the rational basis test. *See City of Cleburne*, 473 U.S. at 455–60, 105 S.Ct. 3249 (Marshall, J., concurring) (noting that the Court's analysis was at odds with traditional rational basis by seeming to require that the legislature has the burden to prove an act was constitutional, that the Court could sift through the record to find a firm factual foundation for an act's policy, and that legislation could not

proceed incrementally). The traditional rational basis test is simply that the party challenging the legislation has the burden to prove "that the statute's classification is not rationally related to the legislative goal." *Trujillo,* 1998–NMSC–031, ¶ 14, 125 N.M. 721, 965 P.2d 305. "In rational basis scrutiny, 'a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *State v. Druktenis,* 2004–NMCA–032, ¶ 112, 135 N.M. 223, 86 P.3d 1050 (quoting *FCC v. Beach Communications,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).

{40} I do not object to giving our rational basis test more teeth in some situations, if we clearly identify what triggers heightened scrutiny, just as the Court of Appeals did in *Alvarez,* 118 N.M. at 740, 886 P.2d at 469 (applying heightened rational basis when legislation implicated a significant interest). But I do not believe it is desirable or appropriate to do so at the expense of the traditional deferential test. If the majority really intends to read *Trujillo* as adopting a single, but broader rational basis test, I think the Court should provide a detailed explanation.

{41} On the other hand, if this Court feels constrained by the traditional rational basis test, I would prefer not to follow the lead of the United States Supreme Court. *See, e.g., Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *City of Cleburne,* 473 U.S. 432, 105 S.Ct. 3249; *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985). In a confusing array of cases, the Court professes to have only one rational basis test, but sometimes appears to apply heightened scrutiny. *See* Laurence H. Tribe, *American Constitutional Law* § 16–33, at 1614 (2d ed.1988) (concluding there is no coherent explanation for when heightened scrutiny is triggered). It seems to me that a better approach would be to give more flexibility to our intermediate scrutiny standard, and to forthrightly acknowledge that we are doing so.

*Level of Scrutiny*

{42} Equal protection challenges to legislative classifications that infringe on important, but not fundamental rights, or involve sensitive, but not suspect classes, must be analyzed under intermediate scrutiny. *See Alvarez,* 118 N.M. at 736, 886 P.2d at 465.

{43} This Court has recognized that the right of access to the courts is an implicit fundamental right. *See Richardson v. Carnegie Library Rest., Inc.,* 107 N.M. 688, 696, 763 P.2d, 1153, 1161 (1988), *overruled on other grounds by Trujillo,* 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305; *Otero v. Zouhar,* 102 N.M. 482, 486, 697 P.2d 482, 486 (1985), *overruled on other grounds by Grantland v. Lea Reg'l Hosp., Inc.,* 110 N.M. 378, 380, 796 P.2d 599, 601 (1990); *Jiron v. Mahlab,* 99 N.M. 425, 426, 659 P.2d 311, 312 (1983). In addition, and of utmost importance in this challenge to the attorney fee limitation, the right of one appeal is explicitly guaranteed by the New Mexico Constitution. N.M. Const. art. VI, § 2 ("an aggrieved party shall have an absolute right to one appeal").

{44} Of course, an individual's ability to have access to the judiciary to resolve legal claims is not endless. *See Jiron,* 99 N.M. at 427, 659 P.2d at 313. As the majority observes, our "courts have previously recognized that the right to access the courts and the right to an appeal are important, although not fundamental, rights for purposes of constitutional analysis." Maj. Op. ¶ 14.

{45} I believe that a worker's right to retain an attorney is one aspect of the right of access to the courts. *See Corn,* 119 N.M. at 210, 889 P.2d at 245 (Apodaca, J., specially concurring). A statute that deprives a class of persons "of the ability to obtain adequate representation in litigation could" deprive that class of a right of access to the courts. *Mieras v. Dyncorp,* 1996–NMCA–095, ¶ 48, 122 N.M. 401, 925 P.2d 518 (Hartz, J., specially concurring). "To the extent that the assistance of an attorney is necessary for the worker to obtain access to the courts, such assistance is entitled to special constitutional protection." *Id.* ¶ 42.

{46} As Worker argues, the fee cap discourages attorneys from taking complex or time-consuming workers' compensation cases. It also creates a risk that attorneys will have to abandon a case when they have exceeded the cap due to economic hardship. As a result of this chilling effect on representation, Amicus New Mexico Trial Lawyers Association claims Section 52–1–54(I) unfairly burdens claimants with complex or time-consuming cases and deprives them from meaningfully exercising the right to an appeal. Because I believe that adequate representation by an attorney is necessary to obtain meaningful access to the courts for an appeal from a workers' compensation proceeding, I would hold that this part of the equal protection challenge is entitled to intermediate scrutiny.

{47} The majority acknowledges that "[m]eaningful access to our appellate courts depends in part on an individual's ability to obtain adequate representation." Maj. Op. ¶ 15 (citing *Herndon v. Albuq. Pub. Sch.*, 92 N.M. 287, 288, 587 P.2d 434, 435 (1978); *Mieras*, 1996–NMCA–095, ¶ 48, 122 N.M. 401, 925 P.2d 518 (Hartz, J., specially concurring); *Corn*, 119 N.M. at 210, 889 P.2d at 245 (Apodaca, J., specially concurring)). The majority holds, however, that the attorney fee cap does not require intermediate scrutiny because Worker has not shown that any workers are prevented from obtaining adequate representation. *See* Maj. Op. ¶¶ 17–20.

{48} Unlike the majority, I would make a distinction between the administrative proceedings and appeals before our courts. In administrative proceedings before a workers' compensation judge, I am willing to agree that the attorney fee cap survives rational basis scrutiny. As the majority observes, whether representation is "adequate," "depends on the circumstances, including the nature of proceedings and the ability of the other side to secure representation." Maj. Op. ¶ 15. Given the nature of the workers'

compensation system, which the Legislature designed as an administrative alternative for dispute resolution, it may be a rational legislative choice to limit attorney fees in order to discourage litigation, reduce costs, and ensure the quick delivery of benefits. *See Corn*, 119 N.M. at 204, 889 P.2d at 239 (stating that due process is a flexible concept when it comes to devising alternative processes for dispute resolution). Thus, vesting adjudicative power in administrative law judges does not, by itself, deny workers the right of access to the courts. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 326, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (holding that an attorney fee limitation, even if it resulted in discouraging attorneys from representing claimants altogether, did not violate due process in a veterans' administrative proceeding which Congress wanted to keep as simple and informal as possible).

{49} In my opinion, however, this analysis changes for appeals before our courts. Unlike the United States Constitution, our State Constitution guarantees the absolute right to an appeal. *See* N.M. Const. art. VI, § 2. Thus, once a worker's case moves from the administrative setting to our courts, "the nature of the proceedings and the ability of the other side to secure representation" requires a more searching inquiry into whether representation is adequate. Maj. Op. ¶ 15. The cap prohibits workers, who have already received the statutory maximum for attorney fees, but are compelled to defend their benefit awards on appeal, from paying for necessary legal services, even out of their own pocket.[1] Thus, the cap forces a class of workers into a position of intolerable risk. They must rely on the good graces of their attorneys to continue representing them in litigation without hope of additional compensation. If these attorneys withdraw, or even worse cut corners, because they cannot af-

---

1. Section 52–1–54(I) "applies as a cumulative limitation on compensation for all legal services rendered in all proceedings," including representation before the courts on appeal. The Act makes it unlawful to accept fees except as provided; any person violating the attorney fee cap may be convicted of a misdemeanor, fined up to $500, and imprisoned for up to 90 days. Section § 52–1–54(A) & (N) (2003). As one state court noted in invalidating an attorney fee cap, most states with statutory limits on workers' compensation attorney fees allow fees to be increased when necessary, or do not make acceptance of additional compensation a crime. *See Irwin v. Surdyk's Liquor*, 599 N.W.2d 132, 142 n. 3 (Minn.1999).

ford to continue the representation due to economic hardship, this vulnerable class of workers may lose the very benefits they won during administrative proceedings.

{50} The majority declines to address the impact of the attorney fee limitation on appeals because it contends there is simply not enough evidence in the record to indicate that Worker was deprived from exercising his right to appeal. The majority relies on *United States Dep't of Labor v. Triplett*, 494 U.S. 715, 723–24, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990). In *Triplett*, the United States Supreme Court rejected a claim that an attorney fee restriction violated access to the courts, concluding the challengers only presented anecdotal evidence that the fee limitation deprived them of legal representation. *Id.* at 724, 110 S.Ct. 1428. The Court ruled that the affidavits of three lawyers, which stated that there were fewer qualified lawyers available to take black lung cases, were "blatantly insufficient." *Id.* at 724–25, 110 S.Ct. 1428. Similar to *Triplett*, the majority would require more evidence in the record that workers with complex or time-consuming cases are unable to obtain representation because of the fee limitation. *See* Maj. Op. ¶ 19.

{51} The majority seems to require an enormous evidentiary burden before it is willing to apply intermediate scrutiny—either that a class of workers are completely unable to obtain representation or that an attorney actually withdraw from representation because of an unreasonable financial burden. I would be more charitable and recognize a class of workers exists whose right to appeal is burdened by the attorney fee cap.

{52} I believe the record and decisions of our courts have sufficiently indicated that the attorney fee limitation deters legal counsel from taking cases like this one. In *Triplett*, the Supreme Court applied a "heavy presumption of constitutionality" to an attorney

fee regime enacted by Congress. 494 U.S. at 721, 110 S.Ct. 1428. The Court thus required those challenging the law to make "an extraordinarily strong showing" that the fee limitation violated due process. *Id.* at 722, 110 S.Ct. 1428. Unlike our case, *Triplett* did not involve the absolute right to an appeal guaranteed by our State Constitution.[2] Because of that difference, the Supreme Court could apply the rational basis test. In contrast, considering the importance of the rights involved, I believe Worker presented enough evidence to challenge the attorney fee cap. Worker presented an expert witness who testified that, since the implementation of the attorney fee cap, very few attorneys are practicing, and only a couple are specializing, in the field of workers' compensation law. The expert testified that attorneys are not representing workers in those cases in which the injury will not result in a large benefit award and the employer is uninsured. This testimony was not contested by the opposing parties. Anecdotally, we all know it to be true. In addition, the workers' compensation judge made a specific finding that the cap causes a chilling effect on legal representation. Our courts have previously acknowledged this chilling effect. *See Corn*, 119 N.M. at 207, 889 P.2d at 242 ("In fact, the cap appears to discourage representation of workers by counsel.").

{53} While it is true that Worker appears to have been fortunate enough to obtain legal representation before the Administration and our courts, he still represents a class of workers who face a burden not shared by other claimants or employers who seek to exercise their right to an appeal. For that reason, intermediate scrutiny is appropriate.

*Intermediate Scrutiny Applied*

{54} Under intermediate scrutiny, the burden is on the party maintaining the statute's validity "to prove that the classification is substantially related to an important govern-

---

2. Worker raises his claim under the New Mexico Constitution. Federal cases do not control when interpreting our State Constitution, but are used only to the extent they are persuasive. *See Alvarez*, 118 N.M. at 735, 886 P.2d at 464. Because the right to one appeal is a state constitutional right, I do not think federal cases are persuasive

on this issue. *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489, 491 ("State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law.").

ment interest." *Marrujo v. N.M. State Highway Transp. Dep't*, 118 N.M. 753, 757, 887 P.2d 747, 751 (1994) (quoted authority omitted). Thus, this Court must examine the governmental interests served by the attorney fee cap, and whether the statutory classifications bear a substantial relationship to any such important interests. *Corn*, 119 N.M. at 211, 889 P.2d at 246 (Apodaca, J., specially concurring).

{55} I have no problem accepting that the attorney fee cap is aimed at advancing important government interests. However, upon examining the impact of the cap on those workers who must participate in an appeal to preserve their hard-won benefits, I do not believe that the employer and the Administration have carried their burden of proving that the attorney fee cap is substantially related to the interests it was designed to address.

{56} Under intermediate scrutiny, a less restrictive means analysis is appropriate. *See Corn*, 119 N.M. at 211, 889 P.2d at 246 (Apodaca, J., specially concurring). Intermediate scrutiny requires a court to balance the importance of the government interests against the burdens imposed on the individual and society. *Id.* One way to assess this balance is for the court "to determine whether alternatives exist that would not burden protected interests as heavily as the classification scheme chosen." *Id.* (quoted authority omitted). Applying this analysis, it is clear to me that the Legislature could have advanced its goals in ways that would have burdened the right to an appeal less.

{57} The majority argues that by discouraging litigation, the attorney fee cap advances one of the purposes of the Act, which is to assure quick and efficient delivery of benefits to workers at a reasonable cost to employers. *See* Maj. Op. ¶ 26. In this case, I fail to see how the cap has prevented the employer from prolonging litigation through its own appeal. Worker was brought involuntarily to the judiciary, and had no choice but to defend his benefits. While I do not mean to suggest that an employer should not have a constitutional right to appeal a deci-

sion of a workers' compensation judge, I do think that in some situations the employer has nothing to lose by appealing a decision. If the worker's counsel is already bled dry by the attorney fee cap, then even if the employer loses on appeal, the employer will not have to pay any more of the worker's attorney fees.

{58} Meanwhile, the fee cap might not have the same effect on employers' attorneys. Paid if they win or lose, and not subject to judicial approval of fees, employers' counsel may be in a better position to prolong litigation through an appeal. If retained by an insurance company, employers' counsel may be able to offset losses incurred in one case due to the fee cap with gains from future cases. Usually, workers' attorneys are not similarly situated. In its practical effect, the fee cap provides employers with an unfair tactical advantage on appeal.

{59} In addition, the cap puts workers in a vulnerable position. Workers who can no longer pay their attorney on appeal might lose benefits won at the administrative level. Thus, at the appellate level, the attorney fee cap is not substantially related to legislative goals of reducing litigation and providing quick and efficient delivery of benefits.

{60} Reducing costs is another important purpose behind the attorney fee limitation. However, in my view, the evidence that only a few cases will exceed the cap, coupled with the fact that not all of those cases will go through an appeal, argues against the necessity of the cap in its present inflexible form.[3] There is no evidence in the record that making allowances for the few cases that deserve attorney fees in excess of the cap for the purposes of an appeal will harm the system. I acknowledge that actuarial uncertainty and insurance costs might rise if the cap were eliminated altogether. But under a less restrictive means analysis, there are other ways to address this potential problem. Instead of precluding a reasonable award altogether for appellate attorney fees, the Legislature could provide for some additional fees for appellate services. The Legislature could

---

3. The Administration states in its amicus brief that "less than 1.5 percent of all attorney fees for workers even potentially penetrated the cap" in 2001 and 2002.

cap those fees. I find it persuasive that many state legislatures allow workers an additional award of attorney fees on appeal, usually with restrictions.[4] Thus, an absolute prohibition on appellate fees is not substantially related to the important interest in reducing costs. The Legislature could advance this goal in less burdensome ways.

{61} The majority also finds that the statutory cap promotes the Legislature's interest in protecting workers' limited benefits. *See* Maj. Op. ¶ 27. In its present form, the Act holds the worker responsible for paying half of any fee awarded to his attorney. If the fee cap is overturned, then fewer net benefits will be available to the worker. I acknowledge the force of this argument. Protecting workers' benefits is an important government interest. However, I do not believe a prohibition on paying appellate attorney fees is substantially related to protecting workers in this situation. Rather, it threatens them with severe harm. Forced to defend their benefits on appeal, workers need adequate representation. Unlike any other appellate party I know of, those workers who have exceeded the cap must either rely on an attorney who is working for free, or proceed alone.

{62} We should not encourage parties to attempt the rigors of the appellate process unaided by counsel. As is evident from the conclusion of the workers' compensation judge that miserly attorney fees cause a chilling effect on representation, the cap discourages counsel from representing workers when there is no money available on appeal. In the extreme, attorneys may withdraw when continued representation will result in unreasonable financial burden. *See* Rule 16–116(B)(5) NMRA 2005; *Corn*, 119 N.M. at 202, 889 P.2d at 237. While any change to the fee cap may cost workers some money, an even greater threat awaits if workers respond inadequately on appeal. Without adequate representation, Worker could lose everything. As one treatise admonishes:

Some legislatures, in their zeal to save claimants from diminution of their net benefits th[r]ough legal fees, carry restrictions on fees to the point where they may well injure claimants as a class both by hindering the growth of an able compensation bar and by making it economically impossible for claimants' lawyers to give the necessary time to the preparation of each case.

8 Arthur Larson & Lex K. Larson, *Workers' Compensation Law* § 133.07, at 133–44 (2003). As we have previously said,

[w]e must avoid a policy or a practice which would discourage representation or the taking of appeals where counsel feels that an injured work[er] has been aggrieved at the trial court level. We must also preserve the right of an injured work[er] to have representation where the employer has appealed.

*Herndon*, 92 N.M. at 288, 587 P.2d at 435.

{63} While I recognize the legislative power to draw lines, there are better ways to accomplish the important government goals at stake than drawing the line at zero. The Legislature is free to set a reasonable limit on fees as long as it makes a reasonable provision for the possibility of fees incurred during appellate review. I also am confident that workers' compensation judges can determine reasonable supplemental awards that would compensate attorneys without unduly impairing workers' benefits.

### APPENDIX

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Oct. 24, 2003.

Appeal from the Workers' Compensation Administration

Gregory D. Griego, Workers Compensation Judge

---

4. *See, e.g.,* Alaska Stat. § 23.30.145(c) (Michie 2000); Ark.Code Ann. § 11–9–715(b)(1) (Michie Repl.2002); Colo.Rev.Stat. § 8–43–403(1) (2003); Or.Rev.Stat. § 656.382(2) (2001); S.D. Codified Laws Ann. § 62–7–36 (Michie 1993 rev.); Vt. Stat. Ann. tit. 21 § 678 (2003); Wash. Rev.Code Ann. § 51.52.130 (West 2002).

## CERTIFICATION TO THE SUPREME COURT

FRY, Judge.

{64} AGW Consultants, d/b/a Turner Environmental Consultants, (AGW) appeals and David Wagner (Worker) cross-appeals from the compensation order and order concerning attorney fees from the Workers' Compensation Judge (WCJ). AGW raises six issues on appeal and Worker raises three issues in his cross-appeal. The issues raised in both appeals fall into two broad categories: those concerning Worker's entitlement to benefits, and those concerning the award of attorney fees to Worker.

{65} As to Worker's entitlement to benefits, AGW argues: (1) that AGW does not have the requisite three employees contemplated by NMSA 1978, § 52–1–6(A) (1990) of the Workers' Compensation Act (the Act) and therefore is not subject to the Act; (2) that the WCJ erred in determining that the accident arose out of and in the course of Worker's employment; (3) that the WCJ erred in determining that Worker's second fall was not an independent, intervening cause; (4) that the WCJ's finding that Dr. Gehlert was an authorized health care provider is not supported by substantial evidence; and (5) that the WCJ's finding that AGW is responsible for Worker's medical bills is not supported by substantial evidence. Worker argues in his cross-appeal (6) that the WCJ's determination of twenty percent loss of use for Worker's scheduled injury is not supported by substantial evidence.

{66} With respect to the issues concerning attorney fees, AGW argues that (1) the WCJ erred in the determination of the fee amount to be paid fifty-fifty. Worker argues that (2) the WCJ erred in rejecting Worker's request to find that AGW and Turner acted in bad faith, a finding that would have permitted an additional award of attorney fees pursuant to NMSA 1978, § 52–1–54(I) (2003). In addition, Worker argues (3) the $12,500 limit (cap) on attorney fees violates equal protection or due process or Worker's right of access to the courts.

{67} We certify the issue concerning the constitutionality of the attorney fee cap to the New Mexico Supreme Court. However, because the certification statute, NMSA 1978, § 34–5–14(C) (1972), and Rule 12–606 NMRA 2003 refer to the certification of "a matter" to the Supreme Court, we conclude that we must certify the entire case even if we wish only to certify one issue. *See Collins v. Tabet*, 111 N.M. 391, 404, 806 P.2d 40, 53 n. 10 (1991) (construing "matter" to mean the entire case). In an effort to assist the Supreme Court, we submit our analysis of the other issues, which we would affirm for the reasons that follow. *See State v. Wilson*, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994) (attaching Court of Appeals' proposed opinion to Supreme Court's opinion on certification).

## BACKGROUND

### *The Accident and Subsequent Medical Care*

{68} AGW, a ground-water hydrology consulting firm, is a common-law business trust. William Turner is AGW's sole trustee. It is undisputed that at the time of the accident, AGW had two part-time employees, Worker and Todd McCabe. Whether Turner was a worker or employee of AGW is a disputed issue.

{69} On April 7, 1999, Worker and McCabe were sent to a particular water well, the S–10, to set up the equipment necessary for temperature readings to be taken of the well. Worker was climbing a ladder on the side of a water tank located near S–10, in order to fill a plastic tube with water so that the tube could be inserted in the S–10. The ladder came loose and Worker fell, breaking his left leg just above the ankle. His first treating physician, Dr. Felter, testified that Worker had "what we considered a compound fracture. That means part of the bone was sticking through the skin, and it was a highly comminuted fracture, which means in many pieces, and it involved the ankle joint itself."

{70} McCabe took Worker to Lovelace Medical Center, where Dr. Felter performed surgery. Worker was released two days later. His leg was in a cast at the time and he was instructed to use crutches, to avoid put-

ting weight on the injured leg, and to keep his leg elevated.

{71} Three days after his release from the hospital, Worker was at home, on crutches. He was reaching for a checkbook that was on top of a bookcase when he raised his arm, lost his crutch, swung on the remaining crutch, kicked out with his injured foot for balance, struck his unprotected toes on the bookcase, pivoted 180 degrees, and fell. He was taken to Lovelace and Dr. Felter performed additional surgery.

{72} Worker subsequently told Turner that he was dissatisfied with his care from Lovelace. Turner suggested another doctor, Dr. White, who suggested Dr. Legant. Turner drove Worker to meet with Dr. Legant. After the meeting, Worker had a second surgery in April and continued to receive medical care from Lovelace until August 1999. At that point Worker again called Dr. Legant, who referred Worker to Dr. Gehlert. At that time, there was concern that the fracture was not healing. Dr. Gehlert provided additional medical treatment, including a bone graft. Ultimately, the WCJ found that Worker incurred over $58,000 in medical bills and was unable to work for roughly a year. The WCJ also found that Worker reached maximum medical improvement (MMI) for the injury on June 5, 2000.

{73} Worker filed his claim on October 12, 1999. At that time he had not yet been released to return to work. He sought Temporary Total Disability (TTD) benefits, Permanent Partial Disability (PPD) benefits, attorney fees, disfigurement compensation, and payment of his medical bills. The complaint indicated the employer/respondent was AGW.

### Pretrial Proceedings

{74} Two things happened during pretrial proceedings that bear on the issues raised on appeal. First, once it became clear that AGW was a business trust, Worker moved to amend his complaint by adding Turner as an Employer/Insurer, on the ground that Turner was the real party in interest. The WCJ granted the motion to amend.

{75} Second, AGW filed a motion to dismiss, based on the contention that Turner, as sole trustee of the business trust, was not within the definition of a "worker" and therefore could not be counted as an employee. Thus, AGW argued, AGW had only two employees, Worker and McCabe, and the Act did not apply. The WCJ denied the motion, finding that Turner was "in the same shoes" as a corporate executive and therefore would be treated as an employee. In support of this decision, the WCJ cited NMSA 1978, § 52–1–7(E) (2003).

### Formal Hearing

{76} After the formal hearing, the WCJ filed a notice of proposed decision, and all parties filed proposed findings and conclusions. The WCJ then entered a compensation order, which, in pertinent part, found as follows. Worker was employed by AGW, a business trust, and not by Turner individually. Turner was an employee of the business. Worker's first injury arose out of and in the course of his employment. The second injury, the fall at home, was incidental to the normal activities of daily living and did not constitute an independent intervening cause. Dr. Gehlert was an authorized health care provider because Worker initially directed medical care, Turner suggested Dr. Legant, and Dr. Legant referred Worker to Dr. Gehlert. Worker was entitled to TTD benefits for roughly one year. Worker reached MMI June 5, 2000, and thereafter had a scheduled injury with a twenty percent loss of use. In addition, the WCJ ordered AGW to pay Worker's reasonable and necessary medical expenses.

{77} We discuss the factual and procedural background relevant to the award of attorney fees when we address the issues concerning that award.

## DISCUSSION

### Worker's Entitlement to Benefits

### The WCJ Did Not Err In Determining That AGW Had Three Employees

{78} AGW contends that Turner, as the sole trustee of the business trust, was not an employee of AGW, relying on two arguments. First, AGW relies on authorities from other

jurisdictions concerning the nature of a business trust. Second, AGW maintains that whether a person is an employee depends on whether that person is subject to the control of another. Consequently, AGW argues, because there is no evidence that Turner's decisions were supervised or controlled in any way by anyone but himself, the WCJ's finding that Turner was an employee of AGW is not supported by substantial evidence.

{79} We review de novo the application of the law to the facts. *Hise v. City of Albuquerque,* 2003–NMCA–015, ¶ 8, 133 N.M. 133, 61 P.3d 842. We apply whole record review to the factual determination of the WCJ. *Herman v. Miners' Hosp.,* 111 N.M. 550, 552, 807 P.2d 734, 736 (1991). In applying whole record review, this Court reviews both favorable and unfavorable evidence to determine whether there is evidence that a reasonable mind could accept as adequate to support the conclusions reached by the fact finder. *Levario v. Ysidro Villareal Labor Agency,* 120 N.M. 734, 737, 906 P.2d 266, 269 (Ct.App.1995).

{80} AGW relies on *In re Hayes' Case,* 348 Mass. 447, 204 N.E.2d 277, 278–79 (1965), where the managing trustee of a business trust filed a claim for workers' compensation benefits after he was injured on the job. The Massachusetts Supreme Judicial Court held that a trustee of a business trust was not an employee of the trust and therefore was not entitled to bring compensation proceedings before the Industrial Accident Board. *Id.* at 280. However, under Massachusetts law, a business trust is not a legally separate entity from its trustees. *Id.* In this case, the parties have assumed that AGW is a separate and distinct entity.

{81} AGW also relies on federal cases holding that the trustees of a business trust are not employees within the meaning of that term as used in the Social Security Act. *United States v. Griswold,* 124 F.2d 599 (1st Cir.1941); *Loring v. United States,* 80 F.Supp. 781 (D.Mass.1948). Under federal law "the most important factor has been the existence of a right in some one [sic] else, either an individual or a collective entity, to control the employee in the performance of his work." *Loring,* 80 F.Supp. at 784; *see also Griswold,* 124 F.2d at 601 (explaining that employees are subject to supervision and control pursuant to the Social Security Act). However, New Mexico uses a different standard to determine whether an individual is a "worker" within the meaning of the Act.

{82} By statute, the provisions of the Act apply to employers of three or more workers. Section 52–1–6(A). The parties do not dispute that AGW is a separate legal entity and that it was an employer within the meaning of the Act. The Act defines a "worker" as "any person who has entered into the employment of or works under contract of service or apprenticeship with an employer. . . . The term 'worker' shall include 'employee' and shall include the singular and plural of both sexes." NMSA 1978, § 52–1–16(A) (1989).

{83} In determining whether a given individual is a worker, the label that the parties have attached to their relationship is not controlling. *Yerbich v. Heald,* 89 N.M. 67, 69, 547 P.2d 72, 74 (Ct.App.1976). Instead, the critical question is whether the individual has a contract of hire with the employer for wages or something of value that is like wages. *See Trembath v. Riggs,* 100 N.M. 615, 619, 673 P.2d 1348, 1352 (Ct. App.1983), *overruled on other grounds by Dupper v. Liberty Mut. Ins. Co.,* 105 N.M. 503, 734 P.2d 743 (1987). *Cf. Joyce v. Pecos Benedictine Monastery,* 119 N.M. 764, 766, 895 P.2d 286, 288 (Ct.App.1995) (stating that a religious novice is not an employee, largely because the novice does not exchange her service for wages); *Jelso v. World Balloon Corp.,* 97 N.M. 164, 168, 637 P.2d 846, 850 (Ct.App.1981) (explaining that an unpaid volunteer is not a worker or employee). In addition, the phrase "contract for hire" has been construed to require a mutuality of assent as well as an exchange of labor for wages or something similar. *Joyce,* 119 N.M. at 767, 895 P.2d at 289.

{84} In this case, the WCJ found that the business trust was created by a contract between Turner and his wife, Regina. Under the contract and supporting documents, Turner is the sole trustee. Trustees are paid reasonable compensation for their ser-

vices. The contract specifically provides that "Trustee(s) ... are like employees and not personally liable when dealing with the Trust properties or matters." Turner signed a document accepting his appointment as trustee. In short, there is substantial evidence in the record supporting the WCJ's finding that Turner is an employee of AGW under the statutory definition of "worker" as interpreted by cases of this Court. The fact that Turner is not subject to the control of another in making decisions concerning AGW is irrelevant.

### Worker's Accident Arose out of and Was in the Course of Employment

{85} All the remaining issues concerning Worker's entitlement to benefits are challenges to the sufficiency of the evidence. In reviewing a claim for sufficiency of the evidence, we review the record as a whole. *Lucero v. City of Albuquerque*, 2002–NMCA–034, ¶ 14, 132 N.M. 1, 43 P.3d 352. "In applying whole record review, this Court reviews both favorable and unfavorable evidence to determine whether there is evidence that a reasonable mind could accept as adequate to support the conclusions reached by the fact finder." *Levario*, 120 N.M. at 737, 906 P.2d at 269.

{86} AGW challenges the WCJ's finding that the first accident arose out of and was in the course of Worker's employment. An injury is in the course of employment if it is incurred when the employee is at a place where he may reasonably be and is engaged in doing something incidental to fulfilling the duties of his employment. *Edens v. N.M. Health & Social Servs. Dep't*, 89 N.M. 60, 63, 547 P.2d 65, 68 (1976). Similarly, an injury arises out of employment if it is a risk "to which the worker is subjected in the employment." *Losinski v. Corcoran, Barkoff & Stagnone, P.A.*, 97 N.M. 79, 80, 636 P.2d 898, 899 (Ct.App.1981).

{87} In support of its argument that Worker was not in the course and scope of his employment, AGW points to Turner's testimony that he had given Worker specific directions concerning how and where to fill the tube with water and that Worker did not follow those specific directions. We note, however, that the WCJ was not required to believe Turner's testimony on this issue. *See Powers v. Miller*, 1999–NMCA–080, ¶ 16, 127 N.M. 496, 984 P.2d 177 (explaining that the trier of fact is not required to believe any particular witness). More to the point, even if Worker did not follow Turner's instructions, that does not, by itself, establish that he was no longer in the course and scope of his employment at the time of the injury. Instead, the question is whether the deviation was so great that Worker was no longer doing anything to further his employer's business. *Frederick v. Younger Van Lines*, 74 N.M. 320, 325–27, 393 P.2d 438, 441–43 (1964); *see also* 1 Arthur Larson *The Law of Workmen's Compensation* § 19.50 (2003). It is undisputed that Worker was injured during work hours at a place that Worker was expected to be while attempting to set up the equipment necessary to take the well temperature measurements. Thus, substantial evidence supports the WCJ's finding that Worker's injury arose out of and was in the course of employment.

### The Second Fall Was Not an Independent Intervening Cause

{88} AGW contends that Worker's fall at home while on crutches was an independent intervening cause and, therefore, AGW was not liable for any of the consequences of the second fall. AGW recognizes that this Court has previously held that "an injury resulting from the concurrence of a preexisting injury and the normal movements of everyday life is a 'direct and natural result' of the original injury." *Aragon v. State Corr. Dep't*, 113 N.M. 176, 181, 824 P.2d 316, 321 (Ct.App.1991) (internal citation omitted). In essence, AGW contends that the second fall was not the result of the normal movements of everyday life. Common sense tells us that moving around one's home is a normal activity of daily life. Indeed, banging one's foot against a stationary object is woefully common. Consequently, substantial evidence supports the WCJ's finding that Worker's fall was compensable. Moreover, we doubt whether *Aragon's* definition of independent intervening cause would

apply at any time before the worker has reached MMI for the accidental injury.

### Dr. Gehlert Was an Authorized Health Care Provider

{89} AGW also challenges the finding that Dr. Gehlert was an authorized health care provider. AGW acknowledges that Turner was aware that Worker was dissatisfied with his treatment at Lovelace and that Turner suggested to Worker that he consult Dr. White. Dr. White informed Worker that he did not treat ankle injuries and referred Worker to Dr. Legant. Turner drove Worker to Worker's appointment with Dr. Legant. Later, Dr. Legant declined to accept Worker as a patient and referred Worker to Dr. Gehlert. This is substantial evidence supporting the WCJ's finding.

{90} It may be that AGW is arguing that Dr. Gehlert was not authorized because Worker failed to provide AGW with a notice of change of health care provider as required by NMSA 1978, § 52–1–49(C) (1990). We question whether an employer who refuses to pay for medical treatment at the time of the injury is nevertheless entitled to formal written notice of a worker's decision to change his health care provider. AGW acknowledges that Worker made the initial selection of health care provider and that AGW never sought to change his selection. AGW paid $2000 to Lovelace for Worker's initial care and thereafter refused to pay for any of Worker's medical care. AGW was well aware of Worker's dissatisfaction with Lovelace and encouraged Worker to see Dr. Legant. AGW did not come forward with any medical evidence that would have supported a determination that Dr. Gehlert's treatment was either unreasonable or unnecessary. Under these circumstances, Worker's failure to notify AGW that he was changing his health care provider is so minor that it does not justify the potentially drastic consequences that AGW seeks. See Fuentes v. Santa Fe Pub. Sch., 119 N.M. 814, 816–17, 896 P.2d 494, 496–97 (Ct.App.1995) (discussing the legal doctrine of de minimis). Thus, we would hold that Worker's failure to notify AGW of his change of health care provider does not make Dr. Gehlert's treatment unauthorized.

### Reasonableness and Necessity of Medical Bills

{91} AGW also argues that the WCJ erred in ordering it to pay Worker's medical bills. AGW contends that the finding of reasonableness and necessity is not supported by substantial evidence. However, AGW did not ask the WCJ to find that the medical bills or expenses were not reasonable and necessary. AGW's findings incorporated Turner's by reference. The only findings Turner asked for on this issue were, in essence, findings that Worker questioned the accuracy of the bills. Thus, AGW cannot challenge the sufficiency of the evidence to support the WCJ's finding. Pennington v. Chino Mines, 109 N.M. 676, 678, 789 P.2d 624, 626 (Ct.App.1990) (stating that "[t]he failure of a party to file a timely request for findings of fact ... precludes evidentiary review").

### Twenty Percent Loss of Use

{92} Although Worker does not challenge the WCJ's determination that the scheduled injury section of the Act is applicable, he argues that the WCJ's finding of twenty percent loss of use of his left leg between the ankle and the knee is not supported by substantial evidence. Worker points out that Dr. Gehlert and Dr. Diskant both gave Worker a permanent partial impairment rating of forty-five percent for the left leg below the knee. However, the WCJ based his determination on loss of use rather than on the impairment rating.

{93} In Lucero v. Smith's Food & Drug Centers, Inc., 118 N.M. 35, 37, 878 P.2d 353, 355 (Ct.App.1994), this Court held that it is not necessary to prove an impairment, as defined by NMSA 1978, § 52–1–24(A) (1990), in order to obtain scheduled injury benefits under NMSA 1978, § 52–1–43 (2003). Worker recognizes our holding, but contends that the concept of impairment rating is essential to determining permanent partial disability. We disagree. Benefits for scheduled injuries are not governed by the rules that apply to benefits for permanent partial disability.

*See Baca v. Complete Drywall Co.*, 2002–NMCA–002, ¶ 24, 131 N.M. 413, 38 P.3d 181. Thus, we would affirm on this issue as well.

### Issues Concerning Attorney Fees

### The WCJ Correctly Split the Liability for Worker's Attorney Fees

{94} During pretrial proceedings, the WCJ ordered AGW to pay $2000 to Worker's attorney as a sanction. The order found that AGW had initially stipulated on the record that it had three employees and the Act applied, and that AGW had later argued its stipulation was incorrect or in error. The order awarded "a sanction in the form of an attorney fee of $2000" payable to Worker's attorneys, representing "the number of hours of work devoted to address this issue including time expended on this issue at two separate hearings before the Administration."

{95} Later, during the fee proceeding, the WCJ awarded Worker the maximum allowable attorney fee of $12,500, and Worker requested a finding that the $2000 previously awarded was a sanction that should not be credited against the attorney fee award. AGW countered that, pursuant to Section 52–1–54(J), it could only be required to pay half of $12,500 plus tax, or $6,613.28, and that the $2000 should be credited against the total amount it owed, leaving it owing $4,613.28. Instead, the WCJ credited the $2000 against the total fee of $12,500, and ordered AGW to pay half of $10,500.

{96} AGW contends the $2000 was simply a part of the total fee awarded to Worker, and pursuant to Section 52–1–54(J), "the payment of a claimant's attorney fees determined under this section shall be shared equally by the worker and the employer." Whether the award was a fee or a sanction is an issue of statutory construction, which is reviewed de novo on appeal. *Morgan Keegan Mortgage Co. v. Candelaria*, 1998–NMCA–008, ¶ 5, 124 N.M. 405, 951 P.2d 1066. We conclude the $2000 awarded by the WCJ was not awarded as a fee under Section 52–1–54, but as a sanction.

{97} We first note that Worker did not argue below or on appeal that the $2000 was awarded pursuant to Section 52–1–54(I) for AGW's bad faith claims processing or litigation conduct. Therefore, we do not consider this potential argument on appeal. *Pinnell v. Bd. of County Comm'rs*, 1999–NMCA–074, ¶ 14, 127 N.M. 452, 982 P.2d 503 (explaining that appellate court will not affirm on grounds not presented to the trial court when to do so would be unfair to the appellant).

{98} We turn now to an analysis of whether the $2000 was a fee or a sanction. A WCJ is authorized by statute to "enter noncriminal sanctions for misconduct" pursuant to NMSA 1978, § 52–5–6(B) (2001). *Carrillo v. Compusys, Inc.*, 2002–NMCA–099, ¶ 11, 132 N.M. 710, 54 P.3d 551. Section 52–5–6(B) specifically gives WCJs the power to

> preserve and enforce order during hearings; administer oaths; issue subpoenas to compel the attendance and testimony of witnesses, the production of books, papers, documents and other evidence or the taking of depositions before a designated individual competent to administer oaths; examine witnesses; enter noncriminal sanctions for misconduct; and do all things conformable to law which may be necessary to enable him to discharge the duties of his office effectively.

The order awarding the $2000 refers to the award as a "sanction" and it may reasonably be read as imposing the sanction due to AGW's misconduct in waffling on the applicability of the Act.

{99} In addition, given the fact that the WCJ did not order this $2000 to be split, it appears that the WCJ deemed the award to be a sanction. If the $2000 was awarded as a noncriminal sanction under Section 52–5–6(B), then it was not awarded as an attorney fee under Section 52–1–54, and none of the provisions of that section apply to the $2000. We would therefore affirm on this issue.

### Bad Faith

{100} Worker requested additional attorney fees in the amount of $2500 pursuant to Section 52–1–54(I), which provides:

> The workers' compensation judge may exceed the maximum amount [of attorney fees] stated in this subsection … if he

finds that a claimant, an insurer or an employer acted in bad faith with regard to handling the injured worker's claim and the injured worker or employer has suffered economic loss as a result. However, in no case shall this additional amount exceed two thousand five hundred dollars ($2,500). As used in this subsection, "bad faith" means conduct ... that amounts to fraud, malice, oppression or willful, wanton or reckless disregard of the rights of the worker or employer.

AGW also requested findings that Worker acted in bad faith. Because the WCJ made no findings at all regarding the bad faith of either party, we remanded the case and asked the WCJ to enter findings and conclusions on the issue.

{101} The WCJ found that, while some of Turner's filings were without a sound basis in law or fact, Turner was not Worker's employer and, therefore, Turner's bad faith was irrelevant. AGW was Worker's employer, and the WCJ found that AGW "did not file excessive, frivolous, or bad faith matters." Consequently, the WCJ concluded that AGW "did not engage in bad faith or unfair claims processing."

{102} This Court has treated bad faith in this context as a finding of fact subject to substantial evidence review. *Murphy v. Duke City Pizza, Inc.*, 118 N.M. 346, 349, 881 P.2d 706, 709 (Ct.App.1994); *Trujillo v. City of Albuquerque*, 116 N.M. 640, 646, 866 P.2d 368, 374 (Ct.App.1993). However, since those cases were decided, the law concerning mixed questions of law and fact has been extended to civil cases. *See, e.g., Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC–033, ¶¶ 6–7, 129 N.M. 698, 12 P.3d 960; *Souter v. Ancae Heating & Air Conditioning*, 2002–NMCA–078, ¶ 19, 132 N.M. 608, 52 P.3d 980. Therefore, "bad faith" is a mixed question of law and fact.

{103} Worker asserts a general argument that the "voluminous and repetitive filings of pleadings," the "repetitious and irrelevant examination" of witnesses, and the "unreasonable contestation of every claim set forth by Worker" establish AGW's bad faith. However, as Worker admits, most of this litigation excess was due to the conduct of Turner rather than AGW. Worker claims that AGW was equally guilty of Turner's bad faith conduct because it concurred in Turner's pleadings.

{104} We are not persuaded. The record shows that Turner filed fifty motions, and AGW did not file any pleadings indicating its concurrence in any of those motions. It is true that AGW adopted and incorporated by reference Turner's list of witnesses and exhibits and Turner's requested findings of fact and conclusions of law. However, we cannot say it was unreasonable for the WCJ to conclude that AGW's adoption of a small number of Turner's pleadings did not constitute "fraud, malice, oppression or willful, wanton or reckless disregard of the rights of the worker." Section 52–1–54(I). The purpose of the bad faith statutory provision is to punish and to deter others from the commission of like offenses. *Sanchez v. Wohl Shoe Co.*, 108 N.M. 276, 278, 771 P.2d 984, 986 (Ct.App.1989). The statute's purpose would be ill-served if AGW were punished for the pleadings it filed, which were appropriate and which raised colorable defenses, or for concurring in three of Turner's relatively innocuous pleadings.

{105} The WCJ made no findings regarding Worker's bad faith or lack of bad faith. Although AGW has not appealed the WCJ's determination that Worker did not act in bad faith, it filed a supplemental brief after remand arguing that the WCJ should have found that Worker acted in bad faith. AGW's argument comes too late; we do not consider contentions made for the first time in a reply brief or a supplemental brief. *Yount v. Millington*, 117 N.M. 95, 100, 869 P.2d 283, 288 (Ct.App.1993).

### Constitutionality of the Cap on Fees

{106} Worker argues that the limitation on attorney fees set forth in Section 52–1–54(I) violates his constitutional rights of equal protection, due process, and access to the courts. The question of whether Section 52–1–54(I) violates a worker's rights of equal protection and due process has not been addressed by a New Mexico appellate court since our Supreme Court established heightened rational

basis analysis in *Trujillo v. City of Albuquerque*, 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305. The question of whether Section 52–1–54(I) violates a worker's right of access to the courts is a matter of first impression. Because these are "significant question[s] of law under the constitution of New Mexico or the United States" and "issue[s] of substantial public interest," Section 34–5–14(C)(1), (2), we certify them to the Supreme Court.

## CONCLUSION

{107} For the foregoing reasons, we would affirm the WCJ's compensation order on all issues except that involving the constitutionality of Section 52–1–54(I), which we certify to the Supreme Court.

{108} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CELIA FOY CASTILLO, Judges.